Case number 19-3427 Western Arkansas and 19-3497 Western Arkansas. Rick Merechka v. Vigilant Insurance Company. Mr. Cohen, if you are ready, you may proceed. Thank you, Your Honor. Good afternoon. May it please the court. My name is Patrick Cowan, and along with Craig Freedman, I represent the insured in this case, Mr. Rick Merechka. Though there are many issues that have been raised for this court to rule upon, the first issue I'd like to discuss, because I believe to be the most important issue, at least from plaintiff's side, or appellant's side rather, to be resolved by the district court, or excuse me, resolved by the appellate court, is the district court's grant of summary judgment for vigilant based upon the district court's stated belief that, and I'm quoting, no rational juror could reconcile the difference between the value of Merechka's property in his bankruptcy petition and the value of his property in the insurance claims. In fact, as is set forth in the district court's order, the district court based this upon its belief, and specifically, I believe, a question from the district court at the hearing on this reasonable juror able to find or reconcile how Rick Merechka acquired $600,000 in property from the time of the filing of the bankruptcy until he had this loss. And simply put, at its essence, he did not. There is no allegation in this case that Rick Merechka acquired $600,000 in property between the time of the bankruptcy and the time of the loss, nor is such an allegation required. If you look at the contents list that that's based upon, that $600,000 number comes from the replacement value listed by Rick Merechka in his contents list. Immediately, $53,951.70 can be stricken as its sales tax. Beyond that, digging through the and listed in the bankruptcy, but their values in the bankruptcy were garage sale type values versus replacement cost type values, which were listed in the contents list. Just for a specific example that stuck out to me, there are $38,500 worth of taxidermied items, elk, bears, deer mounts. I believe there's a grouper or a striper involved in there. That explains a large variance in terms of value of these items listed at a garage sale or what you could sell those items for would be very minor versus what you would replace them for is significantly greater. Counsel, my understanding is that you're talking about a difference, and this is four and a half years, between $9,000, which is what you characterized the value. I'd understand it, I guess, if we're talking about $9,000 versus $50,000, but I just find it unreasonable to believe that any juror would accept that kind of discrepancy. We're talking about thousands of percent here. That's what I was trying to get at in terms of those items. It takes many things to get to that amount. The other important thing to remember is that $600,000 number that we have, that is Mareczka's estimate of what he believes or thought the replacement cost to be, which it's not. Those were his best guesses of his property based upon internet research, his attempts at coming up with a best replacement cost value. The actual replacement cost value is in the record. Vigilant had a company called Inservio, which provides property valuation services and total fire losses to come in and to value the property. I'm trying to find the exact number. It's in the appendix. It's appendix 4432, 4,432. The replacement cost that has come to by Vigilant was $325,825.67, which is a significant disparity in terms of income required to purchase. That's essentially one of the main reasons why I brought this up, was that it's not $600,000 in property that's purchased. The next portion that I didn't feel was appropriately considered by the district court was there was some confusion essentially caused by Rick Mareczka. I'm going to start using Rick Mareczka versus Mr. Mareczka because his brother Lynn Mareczka is also at issue in this case. Rick Mareczka suffered a significant head injury when he fell off an oil drilling platform in 1988 or 1989. As a result of those injuries and the subsequent lawsuit, he received a personal injury settlement that was very substantial. The exact amount is not in the record as it was apparently subject to a settlement that never got specifically entered into the record. Mr. Mareczka refers to a combination of his profit-sharing Halliburton retirement account and the settlement of that lawsuit as, quote, his Halliburton profit-sharing account, which is not a profit-sharing account. All of those proceeds were given to his brother Lynn Mareczka in the mid-90s, I believe 95 or 96, for an administration essentially. And Mr. Lynn Mareczka's deposition took place when Rick Mareczka was pro se and without counsel prior to the involvement of current counsel. Lynn Mareczka also had no counsel. During that deposition, Lynn Mareczka took the Fifth Amendment repeatedly and alternated back and forth between saying he did not recall and asserting his Fifth Amendment privileges. Prior to that deposition, which is actually attached as Exhibit B, I believe, to that deposition, Lynn Mareczka authored a letter which asserted the fact that he had received Rick Mareczka's profit-sharing proceeds as well as his lawsuit settlement proceeds and that whenever Rick needed to buy something, to remodel his house, to do anything of that nature, all he had to do was ask and he would give him that money. There is certainly an issue of fact relating to the money that was available to Rick Mareczka in order to purchase the items between the bankruptcy and the time of the loss. And also very importantly, that has always been the claim from the very first recorded statement, examination under oath, deposition, it has always been claimed that that property was purchased between the time of the bankruptcy and the time of the fire. And it's also, that claim is also backed in the same contents list. On that contents list created by Rick Mareczka, there are dates of items purchased and something along the lines of 80%, 85% of those items are listed subsequent to the bankruptcy. But there are no, there are no credit card receipts or sales receipts or anything right for those, correct? That's correct. There are not. And, but again, same, same thing, your honor. There has, although that it would make this case much easier and I don't think we'd be here if there were, again, Mr. Mareczka and his ex-wife also insured Peggy Orr, they are cash that all of their money is, is in cash. And that is, that is supported. I don't believe it's, I'm not certain whether it's in the record or not. In the bank, in the bank records that were provided to Vigilant, when Vigilant paid out some of the initial living expenses, like immediately, immediately subsequent to the fire, living expenses, some money to purchase clothing and things of that nature. That was the bank account reflects that that was immediately withdrawn and turned back into cash. There's been no questioning. I have no idea why they are that way, but they, they operate solely, virtually solely in cash. They have these accounts that some of their monthly expenses are paid out of things like the, the mortgage payment, the insurance thing dish satellite television, things of that nature, but everything else is cash. So that, that is, that is not, not, not an enjoyable portion of our case, but that is, it's our claim that it's not required. If this court holds that credit card receipts, invoices, things of that nature are required, then any, any person that were to operate in cash or not have receipts or not be able to produce receipts would immediately suffer the same fate in this many people. I'll ask you a quick question. I understand that almost no income is reported on any tax returns, right? Correct. Mr. Moretzka did not, did not report income on tax returns. In fact, for the majority, if not the entirety of this time period, he did not file tax returns. And the only thing that I can say, I can say on that topic is that I think your honor that, I mean, that, that is an issue for, you know, for potentially a tax court, the, the fact that whether he did or did not report income, I don't think is required for the purposes of this case, whether, I mean, we, we have facts and we have testimony and evidence to show income and it's up to a jury to decide whether or not they believe that. You know, I want to, I want to follow up on the credit card receipt point, because I mean, when we're talking about a discrepancy this big in terms of replacement value versus what, say a TV or a couch or something like that, we expect people even operating in cash to have receipts for big ticket items. And so I guess my point is, is, you know, what's unreasonable about and I'm not talking about receipts for everything necessarily, but we have no receipts here. What's unreasonable about expecting some evidence here. I mean, and that's, that's the point that you just made your honor is some evidence. The, the case law discusses, I mean, exactly that no evidence. It does not discuss some sort of a weighing of the evidence in all of those cases that are discussed. The evidence is none. There was no controversy whatsoever as to the purchase of new property in Williams, in Niedenbach. There is no evidence whatsoever. The insurance did not argue that they had purchased new property. They didn't even make that claim. Something as simple as that. It's my contention or it's our contention that the claim alone would be, would be sufficient. It's, it is a jury's point to determine whether or not the property was purchased. But, but beyond that, if we don't just have a bare claim, we actually have a factual basis for the source of funds. And I, as to receipts, I would just simply say, I mean, that's, that's not required. If that's going to be required by the policy, then that needs to be included in the policy language to let someone know on the front end, you need to be retaining receipts for your, for your big ticket items. Plus again, we have to remember that this is a fire that occurred. I mean, there has been testimony that's in the record and the examinations under oath and depositions, all of their, their documents, personal records and things of that nature were destroyed. This was a, a total lost fire. I believe there's pictures in the deposition of the fire investigator. Someone took, you know, this fire fully involved. It was a two story home and the flames on the, on the, on the house are another two stories up and above that. So even if they had kept, you know, receipts, invoices, things of that nature, they would have been most certainly destroyed in the fire. The only receipts, receipts, invoices, or anything that would have been retained would be, you know, credit card, debit card. And since that's not the way that they conduct their business, we won't, you know, we don't have those. And if there's not any further questions, your honor, I'd like to reserve my time for rebuttal. Very well, Mr. Henry. Thank you. Good afternoon, your honor. So may it please the court on behalf of vigilant insurance company, I'll address two points on this appeal. First, the district court properly granted summary judgment on vigilance, defensive misrepresentation, correctly concluding that no rational juror could find the appellant that suffered finance had sufficient financial means to accumulate the contents claimed as lost in the 2015 fire and therefore statements to the contrary amounted to mature misrepresentations. And second, the district court aired a granting summary judgment on vigilance counterclaim as the court failed to provide prior notice to the parties of its intention to adjudicate the issue or allow the parties the opportunity to brief the issues and be heard. As the appellants already outlined that the factual background of the case, there's only a couple of points that bear mentioning. First, as the court has noted, Mr. Burechka declared bankruptcy in 2010, stating his personal property was valued at less than $9,000. He testified in this case that all personal property claimed as lost, all 1200 items claimed were obtained after the bankruptcy. Second, Mr. Burechka never produced a single piece of documentary evidence demonstrating the purchase of any of the 1200 items claimed as lost. Instead, as counsel's noted, he claimed he paid cash for every single item. Third, the mathematical analysis, as your honor identified at the outset, underlying Mr. Burechka's claim mandates that he have had disposable income available to him in an amount orders of magnitude far beyond what the record demonstrates he possibly could have had. With those facts in mind, your honors, we turn to the insurance policy in question, which states as follows. The policy is void if you or any covered person has intentionally concealed or misrepresented any material fact relating to this loss. While the appellant claims this language is ambiguous because of the use of present perfect tense, any uncertainty in the time frame to which the clause applies is eliminated by the phrase before or after the loss. There is no ambiguity in the policy. There are also a number of aspects in this case which are simply not in dispute. There is no dispute that in 2010, the appellant swore under oath that the value of his property was less than $9,000, and he testified in this case his bankruptcy petition was truthful and accurate. There's no dispute the appellant submitted a contents inventory under the conditions provision of the policy listing more than 1,200 separate items of personal property. Again, IMC claimed he purchased after the bankruptcy. There's also no dispute that despite vigilance many requests, the appellant failed to provide a single receipt, credit card statement, or other piece of evidence for any of the 1,200 items. Let me speak for a moment to the issue the counsel just raised about the receipts and buy an 85-inch flat screen television in 2015 with cash from a yard sale. You buy that from a store if it even existed in 2015. You could even buy an 85-inch television, and that store would have an electronic receipt for that purchase. 1,200 separate items and not a single receipt from anywhere or any specific store identified. As the court properly concluded at the district court it's simply not rational. There's also no dispute that Mr. Moretzka's verifiable income during the relevant time period was $1,300 per month, an amount insufficient to allow him to accumulate hundreds of thousands of dollars worth of personal property in a 52-month period, especially considering that the mortgage on his property was in excess of $1,750, giving him a $450-a-month deficiency even before you take into consideration the other expenses he claims to have had, cellular phone, insurance, food, electrical bills. This man was on a fixed income, not support the claims purchases. And while he claims that he received $700 per week from his brother Lynn Moretzka, that claim not only cannot be verified, it's actually refuted by Lynn Moretzka himself, who testified after he gave the statement referred to by counsel. He then testified under that he did not recall giving his brother money and was not aware of any account from which he could take money to give to Mr. Moretzka. Significantly, he also refused to answer questions about whether Mr. Moretzka was employed by him, citing his Fifth Amendment privilege. I don't believe it's an issue for the tax court to decide whether Mr. Moretzka is telling the truth before or after this loss or during this loss. It is significant that he claims to a bankruptcy court that he has no property and then makes this claim later. It is significant that he has claimed that he cannot work and has disability payments, but yet then claims he gets $700 a week for working. Those are all significant points. And the district court properly concluded that no rational juror could reconcile the disparity between the appellant's contents claim and his income, especially considering this negative reported income to exponential ratio. Now, let me speak to the issue of the number. Your Honor has mentioned $607,000, which was the count, the contents list amount. But even if you assume that the actual value of that number is the $325,000 endorsed by Inservio, that still amounts to $6,250 a month, every month in cash that Mr. Moretzka had to have to buy this property. 52 months times 60 to 50 is $325,000. Even Mr. Moretzka doesn't testify that he received that much in cash. At best, he says he received $2,800. If you even take that from the testimony of Lynn Moretzka, which the record doesn't support, you can do. The court said down below, Judge Holmes is very clear in saying the court's required to give reasonable inferences in favor of the appellant and the plaintiff, but not unreasonable inferences and not those at odds with the facts. Quite simply, the court believe the math did not add up. Judge, let me ask you this counsel, which is you just mentioned the $325,000 or whatever from Inservio. Why isn't that the number we look at comparing it to the 600 and whatever it is, 70,000 or 600 and 9,000, I don't remember the exact amount that he claims and not the $9,000 for the bankruptcy? In other words, what I'm asking you is, isn't that number from Inservio more accurate than a number from four and a half years earlier? It very well could be your honor, but even at 325, the math doesn't add up. You properly noted $50,000. If that was the case, if it was $50,000 claimed that we might not be here, but $325,000 is again at $6,250 a month in cash that no one has testified that he received. At best, he's testified that he receives $2,800. And when you back out the deficiency mentioned other, he's got, if you believe that issue about the cash, he's got approximately $2,300 a month, which doesn't come anywhere close to the numbers that everyone has agreed upon. Judge Holmes said, Rechka offers no evidence to demonstrate he purchased additional property since his bankruptcy, let alone property value at almost three times greater than his gross income. And he said, where the evidence to explain the difference between a plaintiff stated property in an earlier bankruptcy petition and an insurance plan, the court may infer not only that the plant made a mature misrepresentation, but the representation was intentional. Here, nothing that Mr. Morechka said could be validated. And almost everything he said could be refuted by concrete evidence. Every time you asked Mr. Morechka for evidence, he'd make a statement. And then when documentation was received, it wouldn't support it. He turns to his brother and says, my brother gave me this money. And my, his brother says, I don't recall giving him any money. These misrepresentations made by Mr. Morechka regarding his property loss were material and they were intentional. He claims hundreds of items of having obtained in a 52 month period, just to give some context, 126 pairs of shoes, 12 firearms, which he wasn't legally allowed to possess 20 pairs of dress pants, 30 pairs of dress shorts, 20 pairs of work pants. And the list goes on and on a bare skin rug in a 52 month period that he purchased all magically with cash that never shows up anywhere in any document. And no one other than Rick Morechka testifies he received. Can I ask a clarification question though? I mean, you're listing all this property. I understand that, but when Inservio came up with 325,000, did they take Mr. Morechka's list or word for it and said, I have 12 firearms. And then Inservio went and said, okay, I'm going to value these 12 firearms that are claimed or where their pictures, what exactly was the state of the record on that? We didn't get pictures until right before the end of discovery, your honor. So there were no at that time. So they took his list and went through and applied their normal as, as a contents inventory person would do and apply a normal value to what he's claiming. There are groups of items. He has $40,000 claim for miscellaneous items, which are impossible to calculate, but to the extent that they could to extent, there was enough information. They applied the normal insurance values to those numbers. So I would. So they, they didn't go out and verify that, um, there was the remnants of the television in the ashes kind of thing. Oh, they did go out, your honor. And they found no remnants of nine separate televisions in the, in the remnants. Nothing was left minor items, a spoon here, a buckle there, but almost nothing was left of the 1200 items. They could not validate anything of any meaningful impact. And that's what brought this situation to an examination in the road. So when there's nothing to be validated in the rubble, we have to ask questions. And when we ask questions and the answers that are given are either proven to be false or not verifiable in any way, that's when it becomes a problem under the insurance policy. The court faced the same issue that needn't Bob versus Amika case in which there was a bankruptcy petition filed and a claim of loss that did not match up. And it was orders of magnitude greater than the record could support. The same issue came up in Liberty mutual versus Scott, where the court couldn't reconcile those differences here. He just could not, it was a shorter timeframe and needn't back. Wasn't it? Absolutely. Your honor. And it always comes down to the math. What does the math allow for in a 52 month period in here? Let's just be generous to Mr. Moretz can take three 25 instead of six Oh seven it's 62 50 a month when he has no stated sources of income other than his disability payment, which is completely eaten up by the mortgage payment. That's the problem here is the math doesn't add up. There are several corollary arguments. I want to touch on briefly before my time expires. The first is the Arkansas value policy law. The appellant claims that because the fire resulted in a total loss, then Arkansas code requires vigil to pay the policy limits on cover J instead of just the amount of the mortgage, which we did pay in the amount of $380,000. The value policy law does not apply. It applies in the circumstance if and only if there is a covered loss. This was not a covered loss. Therefore, it also does if our insurance Arkansas Supreme Court case. The next argument your honor is the issue of severability. Can the content loss be severed from the real property loss such that the full coverage a values can be paid instead of paying, you know, denying the entire claim based on the The answer is no. For over 130 years, the Arkansas Supreme Court has held that where a policy premium is paid in whole, then the contract is indivisible and the contract cannot be separated out to be given to the opponent. The court coined the phrase void as the part of the property insured and void as to all. If there is fraud, it voids the entire policy, not simply the part that the fraud pertains to. In this court, Judge Holmes, in this case, Judge Holmes, consistent with that precedent, holding that Mr. Morales is brought as the content portion amounts of brought us to the entire claim because the policy is not visible in the Arkansas law. In regard to the appellant proof of loss argument, the appellant claims quite novelly that if the proof of loss document is not submitted within 20 days to the insured as required by Arkansas code, then the damages on the contents become liquidated and the entire investigation conducted by vigilance, it must be thrown out. It's not valid. Very simply, there is nothing in the statute that supports that. It's designed to pump the insurance company to get forms being insured quickly. There is no case law that supports the concept that related to the damages, nor does it make any sense to allow that. It allows for, there could be an avoidance of a technical defense by an insurer for an insured not committing a proof of loss if the insurer has submitted the form late. Here, the form was late. Mr. Moretzka voluntarily thereafter submitted a proof of loss. He had a duty to be truthful in that commission and in fact, swore to do so. Additionally, the contents list is a separate condition under the policy. Even if the form was late, there are separate conditions that were probably exempted. If the legislator had wanted to include personal property as part of the value policy law and did not, Arkansas Code Section 2379-126 has no bearing on this case. Fourth, regarding appellant's challenge to trial court's denial of the motion for sanctions, we simply rely upon the argument submitted in the brief. There's no discovery violation occurred here. The trial court's dismissal of that argument is completely supported by the facts. Counsel, I want to get to the issue you bring up, which is the alleged procedural error, and which is not giving notice. I think that that's an interesting issue, but the district court kind of made, you know, we made a ruling and what the district court I think was referring to was the anti-segregation principle, which is that you can't go against your own insured because the insured paid, you know, paid the premiums. And the only exception I could find to that anywhere that as relevant here is when, is if the insured would have started the fire him or herself. And so I'm wondering what use is it to send this back down to the district court on that particular issue, even if you're right on procedural error? The use is that we have to respect the procedure first. You may very well be right, your honor, that the court has to look at this and say, substantively, you're not going anywhere with this claim. But we have the right to be heard on that. We have the right to notice of that. And it was simply not an issue because we believe there was an issue of fact that vigilant would have to testify to certain points that were still in dispute about what was paid and how it was paid. So the court, by depriving us of the right to argue that didn't allow us to deal with those legal issues. The notice is there for a reason. It's to give us the chance to be heard and to argue the points we want to argue. And the court may very well decide substantively that we're wrong. The court may decide that our argument is wrong, but there are arguments, including under Fireman's Firm v. Rogers, that says if an amount shouldn't have had to be paid by the insurance company, then they have the right to seek back the monies that they are owed, that they paid in advance of the mortgagee. Our case, our briefing argument asks that you affirm the trial court's grant of summary judgment of vigilance and reverse the district court's dismissal of the counterclaim. Thank you, Your Honor. Thank you, Mr. Henry. Mr. Cowan, your rebuttal. Anyhow, I'd like to briefly discuss the property, just to point out a few things, and then rebut some of the value policy law arguments made. Vigilant's argument as to the property wavers back and forth between Mareczka didn't purchase the property and then the property was not in the home, essentially an argument that it did not exist. I just want to make it clear that the district court did not have any sort of a finding related to the property did not exist, although that is certainly a very large portion of Vigilant's argument and portion for denying the claim. There were multiple witnesses that had testified they had been to the home, had seen these various items, and have testified to the existence of the property, so that should not be an issue. We have testimony regarding the existence of the property, as well as photographs. We were of the property, so part of Ms. Orr's deposition was to go through photographs of the home, showing these various items throughout the home. So the issue for the court to consider is whether or not they were purchased. Certain items were purchased subsequent to the bankruptcy, or other items were listed and valued in the bankruptcy. Specifically, one thing that I did not bring up earlier that I do want to point out, in the record at the appendix, page 4132, is the portion of the examination under oath where the numbers, as stated in the record, that Rick Mareczka gave to his brother, Len Mareczka, for administration on his behalf is between $250,000 and $500,000, of which that $325,000 number appears squarely in the middle of. So the testimony regarding income or ability to purchase these items is certainly in the record. Further, as related to Mr. Mareczka's taking of the Fifth Amendment, that negative inference should benefit plaintiff, as he has no reason to take the Fifth Amendment but for protecting himself from prosecution from most likely tax evasion. Counsel, you're running out of time. I want to hear about the cross-appeal issue, which is, it appears that there's procedural error here. Do you agree that there was procedural error and that the parties were taken by surprise? I get, well, yes, yes to being taken by surprise, but no as to, you're referring to the procedural error related to arguing of whether or not Vigilant could recoup its monies from Mareczka? Correct. Yes, I think perhaps it's a procedural error, but I don't think it's worth remand. I think that the court has explained in its order appropriately that the only way for Vigilant to be able to recover that would be if Vigilant finds that its damage in that instance arose from Mr. Mareczka's fraud, which it clearly did not. Its obligation under the policy to the mortgagor arose from the policy, the fire, and its separate contract with the mortgage holder. Thank you. I'm out of time, Your Honor, so we'll submit our argument. Thank you. Thank you, Mr. Cowan and Mr. Henry. We appreciate your appearance and arguments today. Case is submitted and we'll...